THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DENYIA CULLUM, administrator of the estate of JAMES JAMAL TAYLOR, | ) ) ) |
| Plaintiff, | ) No. 20 CV 6914 ) |
| v. | ) Chief Judge Virginia M. Kendall ) |
| RYAN WONDRASEK, JAMES ROSS, and MAURICE CARTER, individually and as agents of the COOK COUNTY DEPART OF CORRECTIONS, | ) ) ) ) ) |
| Defendants. | ) ) |

**OPINION AND ORDER**

James Jamal Taylor committed suicide during his pretrial detention at the Cook County Department of Corrections (CCDOC). In this action against CCDOC correctional officers Ryan Wondrasek, James Ross, and Maurice Carter, Taylor's sister Denyia Cullum alleges Defendants violated Taylor's Eight and Fourteenth Amendment rights, pursuant to 42 U.S.C. § 1983.[1] Cullum asserts Defendants failed to provide adequate medical care for Taylor's serious mental health condition and this failure resulted in Taylor's death by suicide (Counts I–III). (Dkt. 114 ¶¶ 30–35, 48, 69, 89). Pending before the Court is Defendants' Motion for Summary Judgement [197] and Defendants' Motion to Strike [213]. For the reasons below, the Court denies Defendants' Motion for Summary Judgment [197] and denies Defendants' Motion to Strike [213].

---

[1] In its Order on Defendants' Partial Motion to Dismiss, the Court dismissed Cullum's claims of negligence (Counts IV–VI), wrongful death (Counts VII–IX), and conspiracy (Counts X–XII) under Illinois law. (Dkt. 177).

1

## BACKGROUND

The following facts are undisputed unless otherwise noted. James Jamal Taylor was a pretrial detainee at CCDOC from September 27, 2020 to September 29, 2020. (Dkt. 206-2 ¶ 1). According to the Chicago Police Department's Arrest Processing Report,[2] Taylor reported that he had "serious mental problems," including schizophrenia, and was not taking his medication. (Dkt. 207-8; Dkt. 215 ¶¶ 2–3).

While in the intake area of CCDOC, Taylor exhibited unusual behavior, including urinating and defecating on himself as well as consuming his own feces, before being escorted to Cermak Health Services by Lieutenant Tony Calvin and other officers, not including Defendants. (Dkt. 215 ¶¶ 4–5; Dkt. 206-2 ¶¶ 8–9, 11, 28–32, 34–35).[3] Calvin determined that Taylor needed "mental help." (Dkt. 215 ¶ 9; Dkt. 207-7 at 31:17–22). CCDOC staff, not including Defendants, assigned Taylor to Division 5, Tier 2J, based on the assessment provided by Cermak Health Services medical staff. (Dkt. 206-2 ¶¶ 4–5). Taylor was classified as a detainee "in housed alone, out housed alone." (Dkt. 215 ¶ 11). On September 29, 2020, Taylor committed suicide in his cell. (Dkt. 206-2 ¶ 50).

---

[2] Defendants' Motion to Strike, (Dkt. 213), is denied as it relates to Defendants' objection to Cullum's use of the Chicago Police Department's Arrest Processing Report as hearsay evidence. (Dkt. 213 at 8); (Dkt. 209-7). The Report itself falls within the exception for public records because it is a statement of a public office (the Chicago Police Department), it details the factual findings of a legally authorized investigation, and Defendants have not shown or even argued the circumstances indicate a lack of trust worthiness. Fed. R. Ev. 803(8); *Brown v. Morsi*, 2018 WL 3141761, at *3 n.3 (N.D. Ill. June 26, 2018). Defendants are correct, however, that Cullum may not use the statement in the Report that Taylor stated he was schizophrenic and unmedicated to establish the truth of his mental health condition because Taylor's statement, not just the Report, must also fall under an exception and it does not. Fed. R. Ev. 805 (Hearsay Within Hearsay). Taylor's statement, however, is relevant to whether he may have exhibited a basic behavioral cue suggestive of suicide risk: statements notifying officials he had a serious mental condition.

[3] Defendants' Motion to Strike, (Dkt. 213), is denied as it relates to these statements of fact concerning the events at the intake area and Calvin's role in them. (Dkt. 216 ¶¶ 5, 7–9). The Court finds these statements of fact material, irrespective of whether Defendants were present in the intake area at this time, because they are relevant to Taylor's mental condition and the question of what response a reasonable officer would have had based on Taylor's behavior.

### a. CCDOC Procedure

Upon entry to CCDOC, all detainees are screened by Cermak medical staff who assess the detainees and classify them according to their medical needs. (Dkt. 206-2 ¶ 4). CCDOC officers receive suicide prevention training at the officer academy and through yearly courses. (*Id.* at ¶ 6). Specifically, CCDOC officers receive training on how to recognize behavioral cues that exhibit "suicidal risk," including the appearance "that the inmate is suffering from a mental illness or is acting in an unusual or bizarre way[,]" "[s]evere behavioral changes," and a "[s]ignificant decrease [in] or lack of grooming." (Dkt. 209-1 at 2–4). When detainees threaten suicide, they are sent to Cermak Health Services immediately. (Dkt. 206-2 ¶ 7).

### b. Officer Wondrasek

Officer Ryan Wondrasek was not present in the intake area where Taylor was temporarily held on September 27, 2020. (Dkt. 206-2 ¶ 8). Wondrasek did not work in Tier 2J, where Taylor was assigned, or encounter Taylor on September 27, 2020 or September 28, 2020. (*Id.* at ¶¶ 8–9). Wondrasek testified at his deposition that he lacked any knowledge of any of Taylor's unusual behavior prior to Taylor's suicide. (*Id.* at ¶ 10); (Dkt. 199-2 at 9:17–21, 12:22–24).

On September 29, 2020, the day of Taylor's suicide, Wondrasek was assigned to Tier 2J, where Taylor was detained, and started his shift around 3 p.m. (Dkt. 206-2 ¶¶ 11–12). Wondrasek passed Taylor's cell twice at approximately 2:54 and 2:55 p.m. respectively, while making rounds to "make sure each detainee was present and showed signs of life." (*Id.* at ¶ 14). Wondrasek asserts that he did not observe any unusual behavior by Taylor either time he passed by and that Taylor asked him for the time the second he passed by. (*Id.* at ¶¶ 115–6; Dkt. 199-2 at 23:10–24:23).

The Court's review of the footage shows Wondrasek quickly passing by Taylor's cell, in which the lights are off, and then briefly stopping by Taylor's cell the second time. (Dkt. 205 at

3:00–5:35). Wondrasek then went to the office area outside the cell block at approximately 2:55 p.m. before returning at 3:12 p.m. (Dkt. 206-2 ¶¶ 17–18). Wondrasek passed by Taylor's cell again at approximately 3:13 p.m. (*Id.* at ¶ 18). The Court's review of the video footage reveals that Wondrasek quickly passed by Taylor's cell without stopping to turn on the light and look inside as he does with seemingly all the other cells. (Dkt. 205 at 22:50–24:00). At approximately 3:33 p.m., Wondrasek leaves the cellblock. (Dkt. 206-2 ¶ 19). At approximately 3:43 p.m., detainee McMichaels looks into Taylor's cell and sees that Taylor has hung himself. (*Id.* at ¶ 20; Dkt. 205 at 57:35–1:01:30). Wondrasek and other officers return at approximately 3:50 p.m. after being alerted by the detainees. (Dkt. 206-2 ¶ 21).

Cullum, however, alleges Wondrasek had knowledge of Taylor's unusual behavior. (*Id.* at ¶ 10; Dkt. 215 ¶ 16). Specifically, Cullum offers the testimony of detainee Antonio McMichaels who states that, on September 29, 2020, he and other detainees had told correction officers, including a tall, white male Cullum asserts fits Wondrasek's description, that Taylor had exhibited unusual behavior including urinating and defecating on himself.[4] (Dkt. 206-2 ¶ 10; Dkt. 215 ¶ 16; Dkt. 130-3 at 39:19–40:24; 87:2–88:21). Specifically, McMichaels states that, on September 29, 2020, the smell of feces alerted him to Taylor's cell where he discovered that Taylor had committed suicide. (Dkt. 130-3 at 37:1–38:8). McMichaels further states that, shortly before he found Taylor had committed suicide on September 29, 2020, a tall, white male correctional officer walked past Taylor's cell but "didn't go up to [it]" and McMichaels "didn't seem him stop." (Dkt. 130-3 at 38:9–39:24; Dkt. 206-2 ¶¶ 14–15). This officer was Wondrasek. (Dkt. 206-2 ¶¶ 14-15, 25; Dkt. 205).

---

[4] Defendants' objection that these statements of fact are vague is overruled because the Court finds them sufficiently detailed. (Dkt. 215 at ¶ 16). The content of McMichaels's statement is also not hearsay as used for the assertion that McCray observed other detainees notifying the officials of Taylor's behavior instead of the truth of the other detainees' statements about Taylor's behavior. Fed. R. Ev. 801.

4

Cullum further offers the deposition testimony of Darrell McCray, who was detained in the cell next to Taylor's and stated that he told multiple officers in Division 5, not including Wondrasek, about Taylor's behavior and that Taylor wanted a psychological evaluation. (Dkt. 199-5 at 26:1–24, 108:01–111:18, 112:4–113:8). McCray also states that, while in Division 5, he personally observed Taylor being verbally nonresponsive as well as urinating and defecating on the floor, that McCray and other inmates attempted to file a grievance on Taylor's behalf on September 28, 2020 and September 29, 2020, and that McCray heard Taylor yell that he wanted a psychological evaluation multiple times.[5] (Dkt. 199-5 at 22:21–23:9, 35:24–42:23). Wondrasek, however, was never asked about a grievance form. (Dkt. 215 ¶ 42). But Wondrasek did receive an alert that Taylor was "to come out alone by himself . . . and also be housed by himself[.]" (*Id.* at ¶ 43).

c. **Sergeant Ross**

Sergeant James Ross did not have direct contact with Taylor until after his suicide and was not on duty on September 27, 2020 or September 28, 2020. (Dkt. 206-2 ¶¶ 28–29). Ross was assigned to Division 5 from 3 p.m. to 11 p.m. on September 29, 2020. (*Id.* at ¶ 30). While McCray states that Ross was one of the officers he spoke to about Taylor's behavior, McCray also misidentifies McCray as a black male. (Dkt. 199-5 at 108:1–22). Ross's job was to supervise the officers in their daily tasks. (Dkt. 206-2 ¶ 30).

---

[5] Defendants' objection that these statements of fact are vague is overruled because the Court finds them sufficiently detailed. Defendants' objection to the introduction of McCray's statement that he heard Taylor yell for a psychological evaluation as hearsay is overruled. (Dkt. 215 ¶ 21). The content of McCray's statement is not hearsay as used for the assertion that McCray observed Taylor displaying concerning behavior in the form of yelling that he needed a psychological evaluation, rather than the truth of Taylor's statement that he wanted an evaluation. *Aguilar v. Gaston-Camara*, 861 F.3d 626, 631 (7th Cir. 2017); *Stinnett v. Iron Works Gym/Exec. Health Spa*, 301 F.3d 610, 613 (7th Cir. 2002) ("The evidence need not be admissible in form . . . but admissible in content.").

### d. Sergeant Carter

Sergeant Maurice Carter was assigned to Division 5 on September 27, 28, and 29, 2020. (Dkt. 215 ¶¶ 31–34). Carter was responsible to make rounds and check on detainees and officers. (*Id.*) Carter had worked in the psychiatric ward for nine years and could recognize a "mental health detainee" based on their behavior. (*Id.*). Defendants, relying on Carter's deposition testimony, assert Carter lacked any knowledge of Taylor's unusual behavior, including defecating, and emphasize that McCray could not "recall the officers that we talked [to]." (Dkt. 206-2 ¶ 36; Dkt. 199-5 at 111:9-18). Cullum relies on McCray's statement that "[e]very officer that came to Division 5, 2J, was acknowledged by me the behavior this guy was displaying whenever I would go to his door or whenever he didn't come out." (Dkt. 196-5 at 112:1–113:8).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Med. Protective Co. of Fort Wayne v. Am. Int'l Specialty Lines Ins. Co.*, 990 F.3d 1003, 1008 (7th Cir. 2021). The Court construes all facts and draws all reasonable inferences in favor of the nonmoving party. *Lewis v. Ind. Wesleyan Univ.*, 36 F.4th 755, 759 (7th Cir. 2022). "A genuine issue of material fact exists only if 'there is sufficient evidence' " for a reasonable jury to return a verdict for the nonmoving party. *BirchRea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). A "material fact" is one that might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "Speculation is not sufficient to survive summary judgment; there must be evidence." *Khungar v. Access Cmty. Health Network*, 985 F.3d 565, 573 (7th Cir. 2021) (cleaned up and internal citations omitted).

6

DISCUSSION

II.     **Motion for Summary Judgment**

    a.  **Failure to Provide Adequate Medical Care**

Claims of inadequate medical care by pretrial detainees are governed by the Fourteenth Amendment. *Gonzalez v. McHenry Cty.*, 40 F.4th 824, 827 (7th Cir. 2022); *Redman v. Downs*, 854 F. App'x 736, 738 (7th Cir. 2021). At the summary judgment stage, Cullum must provide evidence sufficient to permit a reasonable jury to conclude that four elements exist: (1) Taylor had "an objectively serious medical need;" (2) Defendants made volitional acts or omissions concerning Taylor's medical need; (3) Defendants' acts were "objectively unreasonable under the circumstances in terms of responding to [Taylor's] medical need;" and (4) Defendants acted "purposefully, knowingly, or […] recklessly" with respect to the risk of harm associated with Taylor's medical need. *Gonzalez*, 40 F.4th at 827; *Redman*, 854 F. App'x at 739. With respect to the fourth element concerning Defendants' mental states, Cullum must provide evidence showing at least objective recklessness: that "reasonable officers under the circumstances would have understood the high degree of risk involved, making the consequences of the defendants' conduct obvious." *Pittman v. Madison Cty.*, 108 F.4th 561, 572 (7th Cir. 2024).

    *i.*  **Officer Wondrasek (Count I)**

The Court finds a genuine dispute over several facts material to (1) whether circumstances existed under which reasonable officers would have understood the high degree of risk associated with Taylor's serious mental health condition[6] and (2) whether Wondrasek's lack of an adequate response to that risk was objectively unreasonable. Defendants argue Cullum's claim against Wondrasek fails because "Wondrasek never encountered [Taylor] on the days prior to his suicide

---

[6] Defendants don't meaningfully contest that Taylor had an objectively serious medical condition. "Mental-health disorders resulting in suicidal ideation are serious medical conditions." *Redman*, 853 F.App'x at 736.

and had no knowledge of [Taylor's] mental health status." (Dkt. 198 at 4). But Cullum offers sufficient evidence to support a finding that, when Wondrasek was assigned to Taylor's cellblock on September 29, 2020, circumstances existed under which a reasonable officer would have understood the high degree of risk associated with Taylor's serious mental health condition, and that Wondrasek's failure to adequately respond to that risk was objectively unreasonable, including:

- McMichaels's and McCray's testimony that Taylor continued to display behavioral cues of suicide risk identified by CCDOC's own suicide prevention training procedures, such as highly unusual behavior like urinating and defecating in his cell as well as verbal non-responsiveness, and McMichaels's testimony that he told Wondrasek about this behavior. (Dkt. 209-1 at 2–4; Dkt 206-2 ¶ 10; Dkt. 215 ¶ 16; Dkt. 130-3 at 39:19–40:24, 87:2–88:21; Dkt. 199-5 at 22:21–23:9; 35:24–42:23).

- Wondrasek's receipt of an alert that Taylor was "to come out alone by himself . . . and also be housed by himself [.]" (Dkt. 215 ¶ 43).

- The video evidence of Wondrasek's seemingly brief and cursory checks on Taylor's wellbeing. (Dkt. 205 at 3:00–5:35, 22:50–24:00).

The Court therefore denies Defendants' Motion for Summary Judgment as it relates to Count I against Wondrasek.

### ii. Sergeant Ross (Count II) & Sergeant Carter (Count III)

The Court finds a genuine dispute over several facts material to (1) whether circumstances existed under which reasonable officers in Ross and Carter's direct supervisory positions would have understood the high degree of risk associated with Taylor's serious mental health condition and (2) whether Ross and Carter's lack of an adequate response to that risk was objectively

8

unreasonable. Because there is no respondeat superior liability under § 1983, "[o]fficials acting in a supervisory capacity must be aware of [or should be aware of] the unconstitutional conduct and 'facilitate it, approve it, condone it, or turn a blind eye' [to it]." *Mansoori v. Patel*, 2022 WL 683667, at *9 (N.D. Ill. Mar. 8, 2022); *Sanville v. McCaughtry*, 266 F.3d 724, 740 (7th Cir. 2001) (A supervisor "will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.").

Defendants argue Cullum's claims against Ross and Carter fail because they did not have contact with Taylor until after his suicide and lacked knowledge of Taylor's medical condition. (Dkt. 198 at 8). Defendants, however, fail to account for Ross and Carter's direct supervisory role with respect to Wondrasek and the other correctional officers. In addition to Ross and Carter's proximity to the cellblock and duty to directly check in on and oversee officers and detainees, the evidence supports a reasonable inference that Ross and Carter should have understood the significant risk of suicide associated with Taylor's serious mental health condition based on their likely awareness of Taylor's special "housed alone, out alone" classification and McCray's testimony that he told all of the officers in the division about Taylor's behavior, notwithstanding McCray's potential struggle putting a name to the face. (Dkt. 199-5 at 108:1–22; Dkt. 215 ¶ 43). Furthermore, Cullum provides evidence supporting a reasonable inference that Ross and Carter's failure to adequately respond to that risk was objectively unreasonable based on their duty to intervene if an officer was failing to provide adequate care. The Court therefore denies Defendants' Motion for Summary Judgment as it relates to Counts II and III against Ross and Carter.

### b. Causation under § 1983

To support a claim under § 1983, Cullum must not only show that Defendants, acting under color of state law, deprived Taylor of a federal right but also that the deprivation of the federal

right caused the stated harm to Taylor. *Redman*, 854 F. App'x at 739; *see* 42 U.S.C. § 1983. At the summary judgment phase, Cullum "must produce evidence sufficient to persuade a reasonable jury that two types of causation exist: causation-in-fact and proximate causation[.]" *Hunter v. Mueske*, 73 F.4th 561, 567–68 (7th Cir. 2023) ("In assessing causation in § 1983 cases, we look to general principles of causation from tort law."). Proximate causation requires that the harm be a foreseeable, likely result of a defendant's wrongful conduct, rather than the result of an unforeseeable intervening act. *Id.*

Defendants argue that proximate causation is lacking here because (1) suicide is generally considered a voluntary, intervening act under Illinois state tort law and (2) Taylor's suicide was not a foreseeable result of Defendants' conduct. (Dkt. 198 at 10–12). Both arguments fail. First, while § 1983 creates a "species of tort liability," Illinois state law does supply the substantive rules that govern a federal claim under § 1983. *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 362 (2017) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 417 (1976)); *see Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Instead, "[c]ommon-law principles are meant to guide rather than to control the definition of § 1983 claims." *Manuel*, 580 U.S. at 370. Binding precedent recognizing mental health disorders resulting in suicidal ideation as serious medical conditions compels the Court to reject an anachronistic view of suicide as inherently voluntary. *Redman*, 853 F.App'x at 736.

Second, as explained above, Cullum offers evidence that Taylor was exhibiting, under CCDOC's own procedures on suicide prevention training, behavioral cues of suicide risk beyond merely strange behavior. To the extent Defendants rely on the Court's prior expression of doubt as to the foreseeability of Taylor's suicide at the motion to dismiss phase, this reliance is misplaced at the summary judgment phase where the record is significantly more developed. The Court

10

therefore denies Defendants' Motion for Summary Judgment as it relates to Counts I, II, and III on the issue of causation.

## CONCLUSION

For the above reasons, the Court denies Defendants' Motion for Summary Judgement [197] and denies Defendants' Motion to Strike [213]. Where Defendants' Motion to Strike objects to evidence the Court does not rely on, such as the Daniel Report, Defendants' Motion is dismissed as moot.

_____
Virginia M. Kendall
United States District Judge

Date: September 30, 2024